UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DESIGN CONCEPTS OF NIAGARA, LTD., *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 3:11-CV-389-JD ) |
| LIPPERT COMPONENTS MANUFACTURING, INC., | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

This is a contract dispute arising out of a Joint Development Agreement for a product that ultimately failed. Arnold Wolfe, who invented the product, and Design Concepts of Niagara, Ltd., his company, filed this action against their development partner, Lippert Components Manufacturing, Inc. The plaintiffs allege that Lippert breached the Agreement by producing products that contained defects and that failed to live up to the intended specifications. Lippert denies this, and it filed a counterclaim as well, alleging that the plaintiffs breached the Agreement by filing suit after the contract was terminated. The liability phase of discovery is now complete, and both parties have moved for summary judgment on both claims. [DE 53, 59]. For the reasons that follow, the Court denies Lippert's motion, and grants the plaintiffs' motion only as to the Lippert's counterclaim.

### I.  FACTUAL BACKGROUND

In 2005, Arnold Wolfe conceived of an idea for a towable trailer that could also retract its wheels and stand upright to function as a storage unit, which he called the "Tow-N-Stow." Wolfe created a miniature prototype and began seeking partners to develop and manufacture the product. Wolfe also filed patent applications for the product and formed a corporation, Design

Concepts of Niagara, Ltd., to conduct his business through. In 2007, Wolfe met with Lippert Components Manufacturing, Inc., which manufactures a variety of products and accessories in the recreational vehicle market, and the parties executed a License and Joint Development Agreement. The Agreement states that the parties "desire to undertake a joint development program . . . to adapt the Tow and Stow Concept to a marketable product," and that they "desire to undertake a royalty bearing license arrangement permitting Lippert to utilize the Tow and Stow Concept for commercial applications." [DE 1-2 p. 1 ("Agr.") ¶¶ 1.3, 1.4].

The Agreement allocates responsibility between the parties for the various components of the project, but it does so in rather broad strokes. The Agreement assigned Wolfe responsibility for the design and production of the body of the units, including the plastic and hardware components, and for the sales and marketing functions. [*Id.* ¶ 4]. Lippert assumed responsibility for financing the project, engineering the chassis, and manufacturing the final products. [*Id.* ¶ 5]. Each party agreed to "use reasonable efforts to perform its obligations in the Joint Development Programs using the latest state of the art technology available to that Party." [*Id.* ¶ 3.1]. For his compensation, Wolfe received a percentage of the sale price of all units sold. [*Id.* ¶ 7.1]. In addition, Lippert retained the right to terminate the Agreement at any time, for any reason, and both parties had the option of terminating the Agreement in the event of a material breach by the other, provided that they gave written notice of the breach and a sixty day period to cure. [*Id.* ¶¶ 14.2, 14.4].

The parties further agreed to a Statement of Work, the purpose of which was to "set[] forth the details of the deliverables for the Joint Development Program and associated performance benchmarks, resource commitments, milestones, timelines, cost allocations, and responsibilities of the Parties." [*Id.* ¶ 2.9]. The Statement of Work outlined three stages of the

2

project, including the initial prototype and cost analysis phase, the product development and tooling phase, and the production, marketing, and sales phase. [DE 1-3 p. 46]. The Statement of Work provided some added specificity to the tasks allocated to each party, and the parties also agreed to share responsibility for "provid[ing] supervision and management services for product modifications, safety modifications, product testing, [and] manual and warranty writing." [*Id.*]. Under the heading of Spirit of the Statement of Work, Wolfe further agreed to "present a sales posture to create the highest possible selling price the market will bear," while Lippert agreed to "seek to maintain a lean manufacturing environment and systems that will produce the lowest cost of manufactured goods possible consistent with product safety and quality considerations," in order to maximum both parties' profits. [*Id.*].

With the Agreement in place, the parties began developing the product. They retained an outside design engineering firm to finalize the design of the product and began producing a prototype. Both parties suggested a number of changes throughout this process, and the design they finally arrived at in January 2009 was quite different from the initial design. Due to delays in developing and producing the prototype, the parties were unable to conduct the amount of testing they originally intended to, and they completed the prototype just days prior to the May 2009 trade show at which they planned to unveil it. However, the product was very well-received and generated immediate retail demand, so despite the limited testing and production, they began manufacturing and selling the product.

Production of the Tow-N-Stow hit a number of speed bumps at this point. The units' plastic component parts began warping and bowing, which Lippert attributed to Wolfe's decision to use the "blow-molding" method of manufacturing the parts. The warping and bowing caused minor differences between each of the parts and altered the way they fit, which prevented Lippert

3

from manufacturing the units in a uniform and streamlined manner. According to Lippert, this also caused the products to lose their watertight condition, as the parts changed shape after leaving the plant and encountering warmer or cooler temperatures. Lippert insisted that the problem could not be solved without a complete redesign of the components, while Wolfe attributed this problem to improper assembly by Lippert and to Lippert's failure to adequately test the units during their production. Other problems arose after the products' sale as well, including premature wheel bearing failure and tire wear, and rusted axels. Lippert corrected these defects, but only after they caused customer complaints. In addition, Lippert attached incorrect Vehicle Identification Numbers on the early units and failed to include tire placards required by highway safety regulations, so those units could not be titled or legally driven until Lippert corrected the errors.

Despite the strong initial demand for these products, the parties' difficulty manufacturing the units in an efficient manner and the number of complaints the units generated among their customers began to cast doubt on the project's viability. The parties were also unable to reduce the costs of production to the point that the units would be profitable. Sometime after May 2010, Lippert decided not to continue to pursue the patent application on the product, and Lippert finally exercised its option to terminate the Agreement on February 21, 2011. Ultimately, the product never returned a profit, and the parties agree that it failed on the market.

Several months later, Wolfe initiated this action, suing Lippert for breach of the Agreement. Wolfe alleges that Lippert neglected to perform critical evaluation and testing of the product's design before introducing it to the market. According to Wolfe, rather than spend the appropriate amount of time validating the design, ironing out flaws, and developing repeatable manufacturing processes, Lippert rushed the product to market. Further, Wolfe argues that

4

Lippert implemented inadequate quality control, and that once the defects in the product became apparent, Lippert failed to stop production to correct them. Lippert rejects these characterizations, and places fault on Wolfe's decision to use the blow-molding method for manufacturing the plastic components and the constant modifications Wolfe sought in the design. Lippert also viewed Wolfe's suit as a breach of contract itself, so it eventually filed a counterclaim against Wolfe. After completing the first phase of the bifurcated discovery in this matter, the parties have both moved for summary judgment.

## II. STANDARD OF REVIEW

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Conversely, where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Kerri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006); *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case

5

on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). In addition, the pendency of cross-motions for summary judgment does not change the standard of review. *M.O. v. Ind. Dep't of Educ.*, 635 F.Supp.2d 847, 850 (N.D. Ind. 2009). Cross-motions are treated separately under the standards applicable to each. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008).

## III.  DISCUSSION

Both parties claim that the other breached the Agreement—Lippert, by producing defective products, and Wolfe, by suing Lippert. Based on the Agreement's choice-of-law provision, Indiana law governs these claims. The parties have now filed cross-motions for summary judgment, and the Court first addresses the parties' arguments as to Plaintiffs' complaint, followed by their arguments as to Lippert's counterclaim.

### A.     Wolfe and Design Concepts' Claim against Lippert

As to Plaintiffs' breach of contract claim against Lippert, Plaintiffs contend that the facts undisputedly show that Lippert breached its contractual obligations in developing and producing the product, as primarily demonstrated by the many defects in the products. Lippert opposes Plaintiffs' motion on various grounds, and also argues that the claim must be dismissed because Plaintiffs failed to notify Lippert of its breach prior to filing suit. Because cross-motions for summary judgment are treated separately under the standards applicable to each, and because the parties raise different arguments relative to each motion, the Court addresses the parties' respective motions individually.

#### 1.     Wolfe and Design Concepts' Motion

Addressing Plaintiffs' motions first, the Court finds that the record does not permit summary judgment in Plaintiffs' favor. Broadly speaking, the Agreement's focus is on allocating

6

responsibility between the parties for the various tasks involved in developing, manufacturing, and marketing the product, not on defining the standards to which the parties' performance will be held. While the Agreement itemizes each task for which the parties are responsible, the primary benchmark for their performance of those tasks is that they "shall use reasonable efforts to perform [their] obligations." [Agr. ¶ 3.1].

As Plaintiffs themselves recognize, the reasonableness of a party's efforts is an inherently factual inquiry that is often inappropriate for summary judgment, and Plaintiffs do not argue that summary judgment is warranted if Lippert's performance is only held to a reasonableness standard. [DE 60 p. 1 n.1 (noting that Lippert's obligations "to use 'reasonable efforts' and 'good faith judgment' in carrying out certain of its contractual duties . . . are not included in Wolfe's motion as they inherently involve factual determination[s]")]; *Kroger v. Plonski*, 930 N.E.2d 1, 9, 10 (Ind. 2010) (holding that reasonableness is a standard "best applied by a jury after hearing all of the evidence"). In order to escape that conclusion, Plaintiffs look to other terms in the contract to provide concrete performance standards, such as "ready to sell," "final developed product," and "marketable product." Plaintiffs' reliance on those terms is misplaced, though, as their argument equates the project's aspirations with Lippert's contractual obligations. In actuality, the Agreement does not require Lippert to guaranty that the products will meet these standards, as the context of those terms illustrates.

The term "ready to sell" appears in the provision that allocates financial responsibility for the project to Lippert: "Lippert shall provide all financial capital which Lippert in its good faith judgment deems necessary to develop Licensed Products ready to sell . . . ." [Agr. ¶ 5.3]. The provision does not require Lippert to guaranty that the products will ultimately become "ready to sell," only that it commit the capital that, in its good faith judgment, it deems necessary to reach

7

that result. The term "final developed product," which appears in the Statement of Work, similarly establishes no benchmark: "In respect to meeting requirements of the initial prototype development, the final development process, and ongoing production and delivery of the final developed product, and also to include all future developed products mutually decided under the scope of the convertible utility trailer product." This incomplete sentence imposes no obligation at all, and cannot reasonably be read to place sole responsibility for the quality of the products on Lippert. Finally, the term "marketable product" appears in the Background section of the Agreement: "Wolfe and Lippert desire to undertake a joint development program . . . under this Agreement which is intended to adapt the Tow and Stow Concept to a marketable product . . . ." [Agr. ¶ 1.3]. While there is little doubt that the parties intended and desired to create a marketable product, this provision does not allocate the risk of failure to Lippert, nor does it suggest that any deficiencies in the final product, even if Lippert's fault, necessarily constitute breaches of contract.

In arguing to the contrary, Plaintiffs note that contracts must be interpreted so as "to ascertain and effectuate the intent of the parties as reasonably manifested in the agreement." *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, 653 F. Supp. 2d 895, 912 (N.D. Ind. 2009) (citing *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008)). The parties intended to develop a quality product, so any defects in the product must have violated the agreement, Plaintiffs argue. However, regardless of the parties' aspirations in entering into the contract, nothing in the Agreement suggests that the parties intended to allocate the risk of failure to Lippert, and the mere fact that quality problems arose does not prove that Lippert's efforts in discharging their contractual obligations were unreasonable. Those defects might have occurred despite Lippert's best efforts, or may have even been attributable to aspects

of the development for which Plaintiffs were responsible. The Court therefore need not discuss the numerous defects Plaintiffs raise, as they are largely beside the point. The question is whether Lippert used reasonable efforts in performing its obligations, and Plaintiffs have not shown beyond dispute that Lippert acted unreasonably.

Plaintiffs fare no better with regard to the other breaches they allege. They claim that Lippert breached the Agreement when it stopped paying patent expenses for the Tow-N-Stow. However, the only patent fees that Lippert must pay under the Agreement are those that the parties "mutually and reasonably agree upon":

> Lippert shall pay all patent and related legal expenses incurred from and after the Effective Date relating to obtaining the patent for the Tow and Stow Concept in the United States, and such foreign countries, as Lippert and Wolfe in good faith mutually and reasonably agree upon including all maintenance fees and related legal fees . . . .

[Agr. ¶ 5.7]. Thus, there are two ways in which Lippert could breach this provision: by agreeing to pay the expenses and then reneging, or by unreasonably and in bad faith refusing to agree to pay them. But as to the former, the record is unclear as to whether Lippert actually agreed to pay the expenses it issue, and as to the latter, the subjective question of good faith is inappropriate for summary judgment. *See Ashman v. Barrows*, 438 F.3d 781 (7th Cir. 2006) ("Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles."). The Court therefore cannot determine that Lippert breached this provision.

Plaintiffs next argue two ways in which Lippert breached its obligation to "provide all chassis engineering" and "provide all chassis manufacturing and product final assembly and logistics . . . including all federal, state, DOT and international requirements and management regarding titles . . . ." [Agr. ¶¶ 5.8, 5.9]. Plaintiffs first cite quality problems in these areas, including axles that were rusted or suffered premature wheel bearing failure and tire wear, in

9

arguing that Lippert violated this obligation. However, Plaintiffs do not argue that Lippert did not engineer and manufacture the chassis, only that it did not perform those tasks well enough, leading to defects in the products. Those defects do not necessarily equate to unreasonable efforts by Lippert, though, particularly since these products were still in their early stages of production, when flaws and corrections are commonplace. Second, Plaintiffs argue that Lippert breached the latter portion of this provision by attaching incorrect VIN numbers and omitting tire placards needed to title and drive the trailers. While these errors are rather conspicuous, the record is not undisputed as to whether these errors were unreasonable, so summary judgment is inappropriate for this claim as well.

Finally, Plaintiffs allege that Lippert failed to "seek to maintain a lean manufacturing environment and systems that will produce the lowest cost of manufactured goods possible consistent with product safety and quality considerations." [DE 1-2 p. 47]. However, this provision does not require Lippert to *attain* a lean manufacturing environment consistent with those concerns, only to *seek* to maintain one. Even if Plaintiffs could establish that Lippert's manufacturing environment was not consistent with product safety and quality considerations, it would have to additionally show that Lippert did not seek to maintain such an environment in order to establish a breach of this promise, and it has not discharged its burden on that point at summary judgment. Accordingly, the facts do not establish beyond dispute that Lippert breached its obligations under the Agreement, so Plaintiffs' motion for summary judgment must be denied. Having resolved the motion on this ground, the Court need not consider Lippert's other arguments against summary judgment.

### 2. Lippert's Motion

Lippert's motion for summary judgment against these claims falls short as well. Lippert argues that Plaintiffs cannot assert a breach of contract claim because they did not first notify

Lippert of its breaches and demand strict compliance with the terms of the Agreement. The source of this purported obligation is not the Agreement itself; while the Agreement required Plaintiffs to provide notice of breach in order to terminate the contract, it contains no similar condition precedent to filing suit. [Agr. ¶ 14.2]. Rather, Lippert invokes the common law principle that when a party acquiesces to deviations from strict adherence to a contract, it must notify the other party that it intends to demand strict performance before it can assert a breach of contract claim. *T-3 Martinsville, LLC v. U.S. Holding, LLC*, 911 N.E.2d 100, 113–16 (Ind. Ct. App. 2009). Lippert particularly relies on the following language from the Indiana Court of Appeals:

> [W]hen a party deviates from strict performance called for by the contract, the former cannot suddenly declare the deviation a breach of contract. Notice must be given to the other party that strict performance will be required in the future, then if the party continues to deviate, a default can be declared. Similarly, when both parties to a contract acquiesce to a delay, neither side can suddenly declare the contract rescinded and simply walk away. Notice must be given to the other party along with an opportunity to perform within a reasonable time.

*Scott-Reitz Ltd. v. Rein Warsaw Associates*, 658 N.E.2d 98, 104 (Ind. Ct. App. 1995).

These cases do not hold, however, that parties to a contract are always required to provide notice before suing for breach. To the contrary, "the right [to cure] is not guaranteed in every contract, regardless of the parties' actual agreement." *I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1036 (Ind. Ct. App. 1998). Except in limited settings not applicable here, this notice requirement applies only where the party seeking enforcement of the contract has acquiesced to or caused a deviation from the contract. *T-3 Martinsville*, 911 N.E.2d at 116 (holding that notice was required since the parties' conduct "demonstrate[d] a willing delay in [the defendant's] nonpayment of rent," and "both parties acquiesced to a delay in the payment of rent"); *Scott-Reitz*, 658 N.E.2d at 104 (holding that "[the plaintiff] could not *willingly participate in a delay of performance* and then declare the lease rescinded because of delay;

11

reasonable notice had to be given to [the defendant], along with an opportunity to perform within a reasonable time" (emphasis added)); *Pierce v. Yochum*, 330 N.E.2d 102, 112 (Ind. Ct. App. 1975) (holding that notice was required since the plaintiff regularly accepted irregular payments, inducing the defendant into believing that such payments were acceptable).

Under this standard, summary judgment cannot be granted for lack of notice to Lippert of its breach. There are factual disputes at each stage of the analysis, including as to whether Lippert deviated from its obligation to perform its tasks with reasonable efforts in the first place; whether Plaintiffs acquiesced to any deviation;[1] and whether Plaintiffs provided sufficient notice of Lippert's inadequate performance. Most notably, it would be quite difficult for Lippert to show that Plaintiffs, whose volume of feedback Lippert characterizes as a "barrage," ever acquiesced to Lippert using less than reasonable efforts, or that Plaintiffs ever engaged in conduct indicating that they condoned subpar performance. Again, these are fact-specific questions on which the record is equivocal, so Lippert's motion for summary judgment is denied as to Plaintiffs' claim.

**B.     Lippert's Claim against Wolfe and Design Concepts**

The parties have also moved for summary judgment on Lippert's counterclaim, which asserts that "Design Concepts and Wolfe materially breached the Agreement by filing suit after Lippert Components exercised its unilateral right to terminate the Agreement." [DE 45 ¶ 41]. The basis for this claim is difficult to ascertain, and Lippert has not identified any contractual provision that would prohibit Plaintiffs from filing suit, whether before or after the Agreement's

---

[1] Lippert's argument that its breaches, if any, should be excused because Wolfe's faulty design decisions made its performance impossible is misplaced here. Wolfe's design decisions may have jeopardized the quality of the product, but Lippert's performance under the Agreement is not measured by the quality of the product but by the reasonableness of its efforts, and none of Wolfe's decisions prevented Lippert from devoting reasonable efforts to its tasks, even if those tasks were made more difficult by Wolfe's decisions.

termination. Lippert's counterclaim appears to be premised on its argument that Plaintiffs' action against it is meritless, but Lippert offers no grounds on which to conclude that Plaintiff's suit, even if meritless, constitutes a breach of contract itself. If Lippert wishes to seek compensation for having to defend against a frivolous action, it has several avenues available to it, including Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent authority.[2] However, Lippert has identified no basis to sustain a breach of contract action. Accordingly, the Court denies Lippert's motion, grants Plaintiffs' cross-motion, and dismisses Lippert's counterclaim.

### IV. CONCLUSION

For these reasons, Lippert's motion for summary judgment [DE 53] is DENIED, and Plaintiffs' motion for summary judgment [DE 59] is DENIED as to Plaintiffs' claims and GRANTED as to Lippert's counterclaim, which is DISMISSED.

SO ORDERED.

ENTERED:  July 15, 2014

/s/ JON E. DEGUILIO
Judge
United States District Court

---

[2] Recovery through these avenues is unlikely, though, as Lippert's claim appears to rest on the assumption that the only basis for Plaintiffs' complaint is Lippert's termination of the contract, which is not the case.

13